IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| DAVID HAWORTH, ) | |
| ) | |
| Plaintiff, ) | |
| ) | No. 17 C 7038 |
| v. ) | |
| ) | Judge Jorge L. Alonso |
| ROUND LAKE AREA SCHOOLS, ) | |
| COMMUNITY UNIT SCHOOL DISTRICT ) | |
| 116 and CONSTANCE COLLINS, ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff David Haworth sues defendants, the Board of the Round Lake Area Schools Community Unit School District 116 ("Board")[1] and Constance Collins, for terminating his employment in retaliation for his exercise of his rights under the Family and Medical Leave Act ("FMLA"), 29 U.S.C. 2601. This case is before the Court on defendant's motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. For the following reasons, the Court denies the motion.

### I. LOCAL RULE 56.1

Local Rule 56.1 requires a party opposing summary judgment to file "a concise response to the movant's statement [of material undisputed facts] that shall contain . . . a response to each numbered paragraph in the moving party's statement, including, in the case of any disagreement, specific references to the affidavits, parts of the record, and other supporting materials relied upon," LR 56.1(b)(3)(B), and "a statement . . . of any additional facts that require the denial of

---

[1] The captioned entity defendant is the school district rather than the Board, but, as defendants explain in their opening brief, under Illinois law, a school district is merely a geographic area; the legal entity with the capacity to be sued is the Board, who the Court recognizes as the true entity defendant in this case. *See* 105 ILCS 5/10-1, 10-2.

summary judgment." Defendants argue that plaintiff's statement of additional material facts should be stricken to the extent that it misstates the cited record, is improperly argumentative, and contains inadmissible hearsay.

There is some truth in defendants' position, and the Court will disregard those portions of plaintiff's statement that are improper, extraneous, or argumentative. However, it will not strike the statement or any portion of it, which would only require the Court to "waste time by . . . engag[ing] in busywork and judicial editing," rather than "addressing the merits" of the case." *U.S. Bank Nat. Ass'n v. Alliant Energy Res., Inc.*, No. 09-CV-078, 2009 WL 1850813, at *3 (W.D. Wis. June 26, 2009). The Court bears in mind that the purpose of Local Rule 56.1 is "to isolate legitimately disputed facts and assist the court in its summary judgment determination," *Brown v. GES Exposition Servs., Inc.*, No. 03 C 3921, 2006 WL 861174, at *1 (N.D. Ill. Mar. 31, 2006), as district courts do "not have the advantage of the parties' familiarity with the record and often cannot afford to spend the time combing the record to locate the relevant information," *Delapaz v. Richardson*, 634 F.3d 895, 899 (7th Cir. 2011). Despite its shortcomings, plaintiff's statement achieved this purpose by identifying disputed facts and pointing to evidence in the record. Even if plaintiff cited certain hearsay statements, at the summary judgment stage evidence need only be admissible in substance rather than form, *see Cairel v. Alderden*, 821 F.3d 823, 830 (7th Cir. 2016) ("'To be considered on summary judgment, evidence must be admissible at trial, though 'the form produced at summary judgment need not be admissible.'" (quoting *Wragg v. Vill. of Thornton,* 604 F.3d 464, 466 (7th Cir. 2010))), and plaintiff is likely to be able to cure these problems at trial.

## II. BACKGROUND

Round Lake Area Schools Community Unit School District No. 116 is a public school district in Lake County, Illinois. (Pl.'s LR 56.1 Resp. ¶ 1, ECF No. 62.) Plaintiff worked in human

2

resources for the Board, beginning in May 2014. (*Id.* ¶¶ 3-4.) During the onboarding process, plaintiff submitted a "Certificate of Employee Health Examination," in which he disclosed that he had a history of epilepsy, but he was not then taking medication for the condition, nor was he under any medical management for it. (*Id.* ¶ 5.)

Plaintiff's supervisor, Director of Human Resources Jerri Ryan, gave plaintiff a performance rating of "Excellent" for the 2014-2015 school year, the highest of the four possible ratings ("Excellent," "Proficient," "Needs Improvement," and "Unsatisfactory"). (*Id.* ¶¶ 9-10.) For the following school year, plaintiff was promoted to Associate Director of Human Resources. (*Id.* ¶ 11.) At the end of the 2015-2016 school year, Ryan gave plaintiff a lower rating of "Proficient." (*Id.*). On July 1, 2016, plaintiff succeeded Ryan as the Director of Human Resources, as part of a plan for Ryan's transition to retirement. (*Id.* ¶¶ 12-13.) Ryan replaced plaintiff as Associate Director of Human Resources so that she could serve as a resource for him while he learned the Director role. (*Id.* ¶ 13.)

As Director of Human Resources, plaintiff was a member of the "cabinet," a group of senior administrators who met weekly with the district's superintendent, Dr. Constance Collins, to discuss ongoing issues and developments. (*Id.* ¶ 14.) During the 2016-2017 school year, Dr. Collins noticed "deficiencies" in plaintiff's performance in his new role. (*Id.* ¶ 15.) Plaintiff and Dr. Collins began to have one-on-one meetings at a local Panera Bread restaurant to improve their relationship. (*Id.* ¶¶ 15-16.) While Ryan had supposedly put off retiring to serve as a resource for plaintiff to draw on while he learned his new position, plaintiff believed that, far from supporting him, she undermined his efforts to learn the Director of Human Resources role. (*Id.* ¶ 20.)

In January 2017, plaintiff prepared a proposal for a reorganization within the Human Resources department. (*Id.* ¶¶ 21-22.) When they met to discuss the proposal, Dr. Collins pointed

3

out errors with the proposal's data and informed plaintiff that "she expected greater things [from him] than that." (*Id.* ¶ 22.)

On February 7, 2017, Dr. Collins met with plaintiff to discuss his strengths and weaknesses, as well as areas where he needed to improve. (*Id.* ¶ 25.) Dr. Collins told plaintiff she expected greater clarity in communication with the Board and with her, and she gave three examples of situations in which his performance had been deficient: (a) in selecting a professional development software platform, plaintiff had not considered the full cost of the operation and implementation of the system (a criticism that plaintiff disputed); (b) plaintiff had raised his voice in an argument with Dejan Kozic, the Board's Technology Director; and (c) plaintiff had brought a number of proposals to her without first verifying the accuracy of the information they contained. (*Id.*)

On March 12, 2017, Dr. Collins emailed plaintiff to inform him that she had not yet received "closed session item" notes from him, which she needed for her regular meeting with the Board President the following morning. (*Id.* ¶ 26.) Plaintiff acknowledged that it was Dr. Collins's expectation that she would always receive these notes at least twenty-four hours before these meetings and he had not provided them in a timely manner. (*Id.*)

On March 23, 2017, Dr. Collins met with plaintiff again to discuss his performance deficiencies, including (a) his failure to inform her that a former teaching assistant who had been hired as a teacher was erroneously being paid as both a teaching assistant and a teacher simultaneously; (b) his decision, without consulting Dr. Collins or the Board, that a counselor would not have to repay approximately $25,000 she had been mistakenly overpaid; (c) his approval, without Dr. Collins's knowledge, of a realignment in the salary schedule for school social workers, at a significant cost; (d) his allowing a payroll specialist to handle the situation with the overpaid counselor, rather than contacting the counselor himself; (e) his handling of the

4

selection of the professional development software platform, as they discussed during their February 7, 2017 meeting; (f) the erroneous data concerning the reorganization within the Human Resources department; (g) the argument with Kozic; (h) plaintiff's listing his title as "Executive Director of HR" on an organizational chart; (i) his overall communication concerning a transfer of an employee who reported to Heather Bennett, Public Relations Officer; and (j) his communication and transparency with Dr. Collins generally. At the conclusion of the meeting, Dr. Collins informed plaintiff that he was going to receive a rating of "Needs Improvement" for the 2016-2017 school year, and would be placed on an "improvement plan" for the 2017-2018 school year. (*Id.* ¶ 27.)

On April 2, 2017, plaintiff suffered two seizures and was hospitalized. (*Id.* ¶ 28.) Plaintiff's wife notified Ryan, who in turn notified Dr. Collins. (*Id.* ¶ 29.) Plaintiff went on FMLA leave to recuperate. (*Id.* ¶ 30.)

On April 13, 2017, Ryan emailed plaintiff about his return date, writing as follows:

> Connie contacted me last night and expressed concern over your report that you are returning to work on Monday the 17th. Apparently when you spoke to her you told her that your doctor was not going to release you to return until April 25. I told her that you are the HR guy so I'm sure you know not to return without a medical release but wanted to pass her communication along.

(Defs.' LR 56.1 Stmt. Ex. 20, ECF No. 53-22 at 5.) Plaintiff forwarded the email to Dr. Collins, copying Ryan, and explained that initially he had been unable to get an appointment with a neurologist before April 25, but then he had managed to get an earlier appointment on April 14, a Friday, and he expected to be cleared to return to work by the following Monday, April 17. (*Id.* at 4.)

After receiving clearance from both his primary care physician and his neurologist, plaintiff returned to work on April 17. (Pl.'s LR 56.1 Resp. ¶ 35.) Shortly after his return, Ryan spoke

5

with plaintiff privately and told him that, if he ever again forwarded to Dr. Collins an email that she had sent to him alone, she would cease sending him such communications. Plaintiff interpreted this to mean that Dr. Collins was dissatisfied or disappointed with him and that she was not merely "concerned" about his health but that she was "concerned that [he] was coming back" to work at all. (*Id.* ¶ 32; Defs.' LR 56.1 Resp. ¶¶ 6-7, ECF No. 63.)

On the day of plaintiff's return, he and other cabinet members were to speak to the district's administrators at an Administrator Leadership meeting. (Pl.'s LR 56.1 Resp. ¶ 36; Defs.' LR. 56.1 Resp. ¶ 11.) Prior to the meeting, Dr. Collins asked her cabinet members each to present a "'wow' initiative" that "most of the administrators may not be aware of" and "would be pleased to hear." (Defs.' LR 56.1 Resp. ¶ 11.) Plaintiff told the administrators, as he recounted the next day in an April 18, 2017 email, that the Human Resources department is "working on . . . a compensation plan, creating an internal equity in our salary plan based on the consumer price index (CPI) over the past five years. The data will be presented to the Board of Education at a May Board meeting for consideration." (Defs.' LR. 56.1 Stmt. Ex. 21, ECF No. 53-23.)

Dr. Collins and several cabinet members, including Bennett and Kozic, were surprised by plaintiff's announcement because, while they were aware of the project he described, they knew that no salary changes had been approved yet, and they feared that the gathered administrators might interpret plaintiff's comment as confirmation that they were all getting raises. (Defs.' LR 56.1 Stmt. ¶¶ 37-38, ECF No. 53; Pl.'s LR 56.1 Resp. ¶¶ 37-38.) Dr. Collins sent plaintiff an email the following day in which she expressed her surprise and concern, explaining that she had not approved any announcement about this project because the project was still "concept only," had not been thoroughly investigated, and had not been discussed or approved by the Board. (Pl.'s LR 56.1 Resp. ¶ 38.) In his response, plaintiff reminded Dr. Collins that she had asked him to make a

6

"wow" statement about his department's work, and he explained that, only four days earlier, Ryan had told him that she had told Dr. Collins that plaintiff would be presenting the data on the salary project to the Board at the May meeting, just as he had told the administrators. (Defs.' LR 56.1 Stmt. Ex. 21.)

In the days leading up to the May 15 Board meeting, plaintiff, a teacher's union representative, and an assistant principal conducted an investigation into allegations that a teacher had been carrying on an inappropriate relationship with a high school student at a district school. (Pl.'s LR 56.1 Resp. ¶ 39.) Plaintiff and the other investigators concluded that, although the teacher had exercised poor judgment, the circumstances did not warrant a report of potential abuse or neglect to the Department of Children and Family Services ("DCFS"). (Defs.' LR 56.1 Resp. ¶ 26.) At the May 15, 2017 Board meeting, plaintiff informed the Board of this investigation, which, plaintiff, said, had uncovered email conversations between the teacher and student and gifts from the teacher to the student, such as a cell phone. (Pl.'s LR 56.1 Resp. ¶ 43.)

After listening to plaintiff's presentation, Board Vice President Peg Larson stated that her understanding was that it was not school personnel's responsibility to investigate suspicion of abuse; rather, state law required all school personnel harboring any such suspicion to report the suspicion to DCFS immediately. (*Id.* ¶ 44.) Larson immediately provided plaintiff with a handwritten note containing DCFS contact information. (*Id.* ¶ 45.)

At the conclusion of the presentation, Dr. Collins stated, "So David will follow up," and plaintiff replied, "I certainly will." (*Id.* ¶ 47.) That night, Dr. Collins sent an email to several cabinet members, informing them that the Board was not happy with how plaintiff had handled the investigation. (*Id.* ¶ 49.) She wrote, "Concerns: DCFS not contacted. Police not contacted.

7

This did not go well." (*Id.*) Afterward, plaintiff told Kozic he believed the Board's reaction was "very dramatic." (*Id.* ¶ 48.)

The following day, Dr. Collins, Bennett, and two other administrators conducted their own inquiry into the student/teacher relationship. (Defs.' LR 56.1 Resp. ¶¶ 28-29.) At 11:14 a.m. on May 16, Bennett sent an email to the Board stating that they had met with the assistant principal and student resource officer at the high school, and based on what they had learned, they were "confident" that, although plaintiff had been incorrect about some of the details he had presented to the Board, "the situation was and is being handled appropriately," and the evidence did not warrant reporting the matter to DCFS. (*Id.* ¶ 30; *see* Defs.' LR 56.1 Stmt. Ex. 2, Collins Dep. Ex. 42, ECF No. 53-2 at 97.)

Nevertheless, later that afternoon, the union representative convinced plaintiff to do as Larson had instructed and make a report to DCFS. (Pl.'s LR 56.1 Resp. ¶ 52.) On the afternoon of May 16, he did so, and DCFS informed him that it would investigate the allegations. (*Id.* ¶ 53.)

During the same May 15 Board meeting, plaintiff presented proposed administrator salaries for the upcoming school year. (*Id.* ¶ 54.) Board President Kevin Daniels said that plaintiff had provided the Board only with "partial information," and without a comparison to the prior year, a comparison to the budget, and an inclusion of benefits, Daniels said that he did not "know what to do" with plaintiff's data. (*Id.* ¶ 55.) According to plaintiff, he had shown Dr. Collins a spreadsheet of the data he intended to present a few days in advance of the Board meeting, and she specifically told him to remove certain information, including the very information the Board had found the spreadsheet to be lacking. (Defs.' LR 56.1 Resp. ¶ 20.)

On May 17, 2017, Dr. Collins informed plaintiff that she would recommend to the Board that his contract not be renewed for the following school year. (Pl.'s LR 56.1 Resp. ¶ 57.)

8

According to plaintiff, Dr. Collins described two reasons for her decision: (1) plaintiff's presentation of incomplete salary increase information at the May 15, 2017 Board meeting, and (2) his handling of the investigation into the improper student/teacher relationship and his report on the same at the May 15, 2017 Board meeting. (*Id.* ¶ 58; Defs.' LR 56.1 Resp. ¶ 35.) Dr. Collins gave plaintiff the opportunity to resign, and he chose to resign. (Pl.'s LR 56.1 Resp. ¶ 57.) This lawsuit followed.

### III. LEGAL STANDARDS

To prevail on a summary judgment motion, "the movant [must] show[] that there is no genuine dispute as to any mterial fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In considering such a motion, the court must view all evidence and draw all inferences in favor of the non-moving party. *See Wesbrook v. Ulrich*, 840 F.3d 388, 391 (7th Cir. 2016); *Kvapil v. Chippewa Cty.*, 752 F.3d 708, 712 (7th Cir. 2014). At this stage, the court may not weigh evidence or determine the truth of the matters asserted. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "Summary judgment should be denied if the dispute is 'genuine': 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Talanda v. KFC Nat'l Mgmt. Co.*, 140 F.3d 1090, 1095 (7th Cir. 1998) (quoting *Anderson*, 477 U.S. at 248); *see also Bunn v. Khoury Enters., Inc.*, 753 F.3d 676, 681-82 (7th Cir. 2014). The court will enter summary judgment against a party who does not "come forward with evidence that would reasonably permit the finder of fact to find in [its] favor on a material question." *Modrowski v. Pigatto*, 712 F.3d 1166, 1167 (7th Cir. 2013).

The FMLA guarantees eligible employees of a covered employer the right to take unpaid leave for a period of up to twelve weeks for a serious health condition. *King v. Preferred Tech. Grp.*, 166 F.3d 887, 891-92 (7th Cir. 1999) (citing 26 U.S.C. § 2612(a)(1)). Upon return from

FMLA leave, employees must be restored to the same position or an equivalent one, with the same benefits and terms of employment. *Id.* (citing 26 U.S.C. § 2614(a)). It is unlawful for any employer to "interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided" by the FMLA, 26 U.S.C. § 2615(a)(1), or to "discharge or in any other manner discriminate against any individual for opposing any practice made unlawful" by the FMLA, 26 U.S.C. § 2615(a)(2). The FMLA's implementing regulations provide that the FMLA's "prohibition against interference prohibits an employer from discriminating or retaliating against an employee . . . for having exercised or attempted to exercise FMLA rights." 29 C.F.R. § 825.220(c). Further, "employers cannot use the taking of FMLA leave as a negative factor in employment actions." *Id.*

The Court generally "evaluate[s] a claim of FMLA retaliation the same way that [it] would evaluate a claim of retaliation under other employment statutes, such as the ADA or Title VII." *Buie v. Quad/Graphics, Inc.*, 366 F.3d 496, 503 (7th Cir. 2004). Plaintiff must adduce evidence that "(1) he engaged in a protected activity; (2) his employer took an adverse employment action against him; and (3) there is a causal connection between the protected activity and the adverse employment action." *Pagel v. TIN Inc.*, 695 F.3d 622, 631 (7th Cir. 2012). "To succeed on a retaliation claim, the plaintiff does not need to prove that retaliation was the *only* reason for her termination; she may establish an FMLA retaliation claim by showing that the protected conduct was a substantial or motivating factor in the employer's decision." *Goelzer v. Sheboygan Cty., Wis.*, 604 F.3d 987, 995 (7th Cir. 2010) (internal quotation marks omitted).[2] "A plaintiff can avert

---

[2] Some courts have held that the motivating-factor standard is no longer applicable to FMLA retaliation claims under the logic of the United States Supreme Court's decision in *University of Texas Southwest Medical Center v. Nassar*, 570 U.S. 338, 359-60 (2013), which held that the language of Title VII's retaliation provision, 42 U.S.C. § 2000e-3(a), requires "claims [to] be proved according to traditional principles of but-for causation." *See, e.g., Baird v. Progress Rail Mfg.*, No. 17 CV 3848, 2019 WL 2210811, at *11 (S.D. Ind. May 21, 2019). For FMLA retaliation claims governed by 29 U.S.C. § 2615(a)(2), this

summary judgment on an FMLA retaliation claim . . . by proffering [either] direct or circumstantial evidence of her employer's discriminatory motivation." *Lewis v. Sch. Dist. #70*, 523 F.3d 730, 741 (7th Cir. 2008). As under Title VII, "the appropriate question on summary judgment is simply: could a reasonable jury find based on *all* available evidence that a . . . retaliatory motive caused [plaintiff's] termination?" *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 569 (7th Cir. 2017); *cf. Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 764 (7th Cir. 2016) ("[Under Title VII,] [t]he sole question that matters [is] [w]hether a reasonable juror could conclude that [plaintiff] would have kept his job if he had [not taken FMLA leave,] and everything else had remained the same.").

## IV. CAUSATION

Defendants argue that they are entitled to summary judgment because plaintiff cannot prove any causal link between his taking FMLA leave and defendants' decision not to renew his contract.

---

argument may have some force, given the similarity of that provision to Title VII's retaliation provision. *Compare* 29 U.S.C. § 2615(a)(2) ("It shall be unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter.") *with* 42 U.S.C. § 2000e-3 ("It shall be an unlawful employment practice for an employer to discriminate . . . against any individual . . . because he has opposed any practice made an unlawful employment practice by this subchapter."). But, as the Second Circuit has explained, when an employee claims to have been terminated merely for taking FMLA leave, rather than for complaining about his employer's practices surrounding FMLA leave requests, it is 29 U.S.C. § 2615(a)(1) ("It shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter.") that governs his claim. *Woods v. START Treatment & Recovery Centers, Inc.*, 864 F.3d 158, 167 (2d Cir. 2017) ("Being fired for *taking* FMLA leave cannot easily be described as 'opposing any practice made unlawful' by the FMLA. Instead, that adverse employment action in the face of a lawful exercise of FMLA rights fits comfortably within § 2615(a)(1)'s 'interfere with, restrain, or deny' language."). The Court sees little textual reason to apply *Nassar* to a § 2615(a)(1) retaliation claim, *see Woods*, 864 F.3d at 167-68, and the Seventh Circuit has not yet had occasion to weigh in on the question. *See Malin v. Hospira, Inc.*, 762 F.3d 552, 562 n.3 (7th Cir. 2014). Thus, the motivating factor test still represents "the controlling law in the Seventh Circuit." *White v. United Credit Union*, 111 F. Supp. 3d 878, 883-84 (N.D. Ill. 2015); *see Arriola v. Cardinal Stritch Univ., Inc.*, No. 18-CV-36, 2019 WL 970626, at *6 (E.D. Wis. Feb. 28, 2019) (citing *Goelzer* for motivating-factor standard); *McLaren v. Wheaton Coll.*, 194 F. Supp. 3d 743, 751 (N.D. Ill. 2016) (same); *Noone v. Presence Hosps. PRV*, 149 F. Supp. 3d 904, 913 (N.D. Ill. 2015) (same). Regardless, there is no need to examine the issue closely here because, under either standard, plaintiff's claim survives summary judgment. *See Malin*, 762 F. 3d at 562 n.3; *White*, 111 F. Supp. 3d at 884.

11

Plaintiff argues that, even if there is no direct evidence of a retaliatory motive because Dr. Collins never disparaged plaintiff or anyone else for taking FMLA leave or otherwise expressed disapproval of taking FMLA leave, there is sufficient circumstantial evidence of retaliation to create a genuine issue of fact for trial. While it is undisputed that Dr. Collins was already dissatisfied with plaintiff's performance before he took FMLA leave, it is also undisputed that, on March 23, 2017, Dr. Collins told plaintiff that he would receive a rating of "Needs Improvement"—not the lowest rating—and be placed on an "improvement plan" for the 2017-2018 school year. Thus, at that time, shortly before plaintiff took FMLA leave on April 2, Dr. Collins was contemplating bringing plaintiff back for the following school year. On April 17, the very day plaintiff returned from FMLA leave, Dr. Collins criticized plaintiff for revealing the salary equity plan to the administrators, a criticism that plaintiff argues was baseless. Only a month later, Dr. Collins let plaintiff go, ostensibly based on his mistakes during the May 15, 2017 Board meeting, but plaintiff argues that a jury could conclude that this reason was a pretext for retaliation because it is factually baseless.

Plaintiff's side of the story (which the Court must accept as true at this stage of the case) is that he did nothing wrong in any of these incidents, and, in two of them, to the extent he did anything wrong, Dr. Collins herself is at least partially to blame. According to plaintiff, (1) at the April 17 administrator meeting, plaintiff said only that he would present the salary equity plan data to the Board at a subsequent meeting, exactly as Ryan had previously reported to Dr. Collins, and he did that only because Dr. Collins had asked him to present a "wow" initiative; (2) based on the meager evidence of abuse, plaintiff was correct that the evidence did *not* warrant reporting the findings of the student/teacher investigation to DCFS (*see* Pl.'s LR 56.1 Resp. ¶¶ 41-50; Defs.' LR 56.1 Resp. ¶¶ 28-30; Defs.' LR 56.1 Stmt. Ex. 2, Collins Dep. Ex. 42, ECF No. 53-2 at 97);

12

and (3) it was Dr. Collins who instructed plaintiff to remove from the spreadsheet that he presented to the Board the very salary information that she later faulted him for omitting.

Thus, according to plaintiff, there is circumstantial evidence of suspicious timing and that Dr. Collins offered a pretextual reason for letting him go, which creates a genuine issue of fact. *See Coleman v. Donahoe*, 667 F.3d 835, 860 (7th Cir. 2012) (finding evidence of suspicious timing and pretext "sufficient to present a genuine issue of fact as to the [defendant's] motives").

Defendants reply that there is nothing suspicious about either the timing of Dr. Collins's decision or her reasons for it. According to defendants, the evidence shows that Dr. Collins had identified deficiencies in plaintiff's performance before he took FMLA leave, and she decided to let him go not because he took FMLA leave but based on his record of poor job performance both before and after he went out on leave. Dr. Collins had conveyed to plaintiff before he took FMLA leave that his communication with her and the Board was insufficient and inadequate, and this deficiency remained after he returned: it was his botched attempt to communicate with the Board at the May 15, 2017 meeting that immediately precipitated his resignation. Defendants argue that, under these circumstances, no reasonable juror could conclude Dr. Collins's reasons for letting plaintiff go were a pretext for FMLA retaliation.

Defendants correctly argue that suspicious timing alone is insufficient to give rise to an inference of causation unless the suspicious adverse action "follows close on the heels of protected expression." *Kidwell v. Eisenhauer*, 679 F.3d 957, 966 (7th Cir. 2012). They are also correct that "[m]erely disagreeing with an employer's reasons" does not make them pretextual. *Tibbs v. Admin. Office of the Ill. Courts*, 860 F.3d 502, 506 (7th Cir. 2017). Plaintiff must demonstrate not just "faulty reasoning or mistaken judgment on the part of the employer," but that the employer's reason is a "lie, specifically a phony reason" for the adverse employment action. *Id.* (internal

13

quotations marks omitted). He may do so by, for example, pointing to evidence that the proffered reason is "factually baseless" or "insufficient to motivate" the employer's action. *Id.* (internal quotations marks omitted).

Plaintiff has done more than merely register disagreement with Dr. Collins's reasons for letting him go; he has shown that, based on the evidence in this case, a reasonable jury could conclude that they were "phony." First, "[a]s a general rule, a reasonable trier of fact can infer pretext from an employer's shifting or inconsistent explanations for the challenged employment decision." *Castro v. DeVry Univ., Inc.*, 786 F.3d 559, 577 (7th Cir. 2015). Plaintiff testified that Dr. Collins told him on May 17, 2017, that she was letting him go because of his mistakes during the May 15 Board meeting, namely, because of (1) his mishandling of the student/teacher investigation and the related portion of his presentation to the Board and (2) because the information he provided the Board about proposed administrator salaries was incomplete. (Defs.' LR 56.1 Resp. ¶ 35; Pl.'s LR 56.1 Resp. ¶ 58.) Defendants argue now that it was not just the May 15 Board meeting that caused them to let plaintiff go but also his pre-FMLA-leave performance deficiencies and his failure to call DCFS, as Larson had instructed, immediately after the May 15 Board meeting. But a reasonable jury could believe plaintiff's testimony that Dr. Collins never mentioned anything to him other than the mistakes of the May 15 Board meeting, and if so, these additional factors are properly characterized as the sort of "shifting and inconsistent explanations for the challenged employment decision" from which a jury might infer pretext, not the sort of multi-faceted explanation that is a "greater challenge" for a plaintiff to overcome. *Cf. Tibbs*, 860 F.3d at 506.

Even leaving aside whether defendants have offered shifting or inconsistent explanations, a reasonable jury could find that any and all of their explanations are pretextual. Although

14

defendants highlight the "significan[ce]" of plaintiff's "performance deficiencies prior to taking his FMLA leave" (*see* Defs.' Mem. in Supp. Mot. Summ. J. at 14, ECF No. 54), a reasonable jury could find that, actually, the critical events were those that took place between March 23, 2017, when Dr. Collins gave plaintiff the impression that he would be retained for another school year, and May 17, 2017, when she told him otherwise. *See Phelan v. Cook Cty.*, 463 F.3d 773, 788 (7th Cir. 2006), *overruled on other grounds by Ortiz*, 834 F.3d at 765-65 ("Phelan introduced evidence that her termination was inconsistent with her satisfactory performance of her job shortly before termination."). Indeed, defendants seem to admit this by arguing that "intervening" events taking place after plaintiff returned from FMLA leave caused Dr. Collins to seek his resignation, even as they argue simultaneously that Dr. Collins's decision was based on pre-FMLA leave shortcomings as well. (*See* Pl.'s LR 56.1 Resp. ¶ 58.)

Viewing all evidence and drawing all reasonable inferences in plaintiff's favor, a reasonable jury could find that defendants' post-FMLA-leave, "intervening" reasons were a pretext for retaliation. The jury could find that Dr. Collins sabotaged plaintiff's May 15 presentation on proposed administrator salaries by telling him to remove certain information that she knew the Board expected to see. Further, the jury could find that Dr. Collins seized on the Board's unfairly "dramatic" reaction to plaintiff's presentation on the student/teacher investigation to justify letting him go, although she knew that he had not done anything wrong. Defendants highlight plaintiff's failure to call DCFS immediately after the May 15 Board meeting or early the next morning, but this rationale is particularly "fishy," *see Loudermilk v. Best Pallet Co., LLC*, 636 F.3d 312, 315 (7th Cir. 2011), because, by 11:14 a.m. on May 16, Bennet was already sending an email, copying Dr. Collins, stating that no such call was necessary. These explanations are "fishy enough to support an inference that the real reason must be discriminatory." *Loudermilk*,

15

636 F.3d at 315. A jury could conclude that Dr. Collins's reasons for letting plaintiff go were pretextual, both individually and in combination, because they have an insufficient basis in fact or were insufficient to motivate termination, in the sense that Dr. Collins knew that plaintiff was not at fault in these incidents, at least not for the reasons she has cited.

Evidence of pretext is usually not enough by itself to allow an employment discrimination plaintiff to survive summary judgment; there must be some other evidence pointing toward a discriminatory motive. *Lane v. Riverview Hosp.*, 835 F.3d 691, 697 (7th Cir. 2016). In this case, the suspicious timing of the decision to let plaintiff go, only a few weeks after he returned from FMLA leave, provides additional support for an inference of causation.

Defendants are correct that when evidence of suspicious timing is the *only* evidence of retaliation, the adverse action usually must come within a few days of the protected activity. *See Kidwell*, 679 F.3d at 966. But when evidence of pretext is combined with evidence of suspicious timing, an adverse action four or five weeks after the protected activity might be close enough to support an inference of causation. *See Coleman*, 667 F.3d at 861-62; *Phelan*, 463 F.3d at 788. In a case such as this, in which there is evidence of both pretext and suspicious timing, a "jury, not a judge, should decide whether the inference [of causation] is appropriate." *Coleman*, 667 F.3d at 861 (internal quotation marks omitted).

Additionally, if the jury finds plaintiff credible, it could find that Dr. Collins began to build a file to justify plaintiff's termination as soon as he returned from FMLA leave by unfairly criticizing him for revealing the salary equity plan to the administrators, although the information he revealed was true and did no harm. *See Martinez v. Ind. Univ. Health, Inc.*, No. 12-CV-00567, 2014 WL 309399, at *2 (S.D. Ind. Jan. 28, 2014) ("'[A]n employer's sudden dissatisfaction with an employee's performance after that employee engaged in a protected activity may constitute

16

circumstantial evidence of causation.'" (quoting *Culver v. Gorman & Co.,* 416 F.3d 540, 546 (7th Cir. 2005)); *Swanson v. Allstate Ins. Co.*, 102 F. Supp. 2d 949, 973 (N.D. Ill. 2000) ("Ms. Swanson has submitted evidence which, if accepted by the jury, could reasonably lead to the conclusion that the [written warning] was part of an effort to create a record to support a termination of Ms. Swanson in retaliation for her complaints."). Dr. Collins did not expressly rely on this incident for letting plaintiff go, but its timing is suspicious and bolsters the inference of a retaliatory motive.

Defendants may well have had a legitimate basis to let plaintiff go. For example, even if plaintiff was proved correct in informing the Board that there was no basis for reporting the improper student/teacher relationship to DCFS, it seems at least that his lack of command of the details of the situation in his presentation caused an unnecessary panic. Similarly, he may have exercised bad judgment in disclosing the salary equity plan to the administrators before anything was finalized. But what matters is not whether defendants had a good reason to terminate plaintiff, but what the real reason was. Based on all the evidence and circumstances in this case, a reasonable jury could conclude, based on the evidence of suspicious timing and pretext, that defendants decided not to renew plaintiff's contract in retaliation for taking FMLA leave.

## CONCLUSION

For the reasons set forth above, defendant's motion for summary judgment [52] is denied. A status hearing is set for August 7, 2019.

**SO ORDERED**                                                            **ENTERED: July 15, 2019**

 

**HON. JORGE L. ALONSO**
**United States District Judge**

17